Filed 5/23/22  In re D.S. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re D.S. et al., a Person Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SAMANTHA H.,<br><br>    Defendant and Appellant. | F083385<br><br>(Super. Ct. Nos. JD140836, JD140837, JD140838)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Susan M. Gill, Judge.

Michelle L. Jarvis, under appointment by the Court of Appeal, for Defendant and Appellant.

Margo A. Raison, County Counsel, and Judith M. Denny, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

Appellant Samantha H. (mother) is the mother of children D.S., S.S., and R.J., who are subjects of a dependency case. Mother challenges the juvenile court's orders issued at a contested selection and implementation hearing that resulted in mother's parental rights being terminated. Mother contends the juvenile court erred by considering inappropriate factors when it failed to apply the beneficial parent-child relationship exception to termination of parental rights. We disagree and affirm the juvenile court's orders.

**FACTS**

*Initial Removal*

On March 9, 2020, the Kern County Department of Human Services (department) responded to investigate after 12-year-old D.S., 10-year-old S.S., and 7-year-old R.J. (collectively "the children"), were placed into protective custody by the Kern County Sheriff's Department. The children were removed after their temporary care provider could no longer care for them. Mother was staying in the home with the children, but the care provider suspected mother began using drugs again. In addition, mother failed to follow through with voluntary family maintenance services, including drug testing and substance abuse treatment.

Voluntary family maintenance services were initially agreed to by mother after the department's January 2020 investigation determined mother was using methamphetamine. Mother had the children live with a friend while she was struggling with drug use during the six months prior to a referral investigated on January 15, 2020. There were also concerns for the children's safety due to mother's decision to allow contact between, Zackary J., the father of R.J., despite a restraining order and an ongoing investigation into whether Zackary sexually abused D.S.

The department filed original petitions on behalf of the children alleging that the children were each described by Welfare and Institutions Code section 300, subdivision

2.

(b)(1).[1]  The petitions alleged the children were at substantial risk of suffering serious physical harm due to mother's substance abuse, domestic violence with Zackary, and failure to protect the children from physical abuse by Zackary.  The petition for R.J. included an additional allegation pursuant to section 300, subdivision (a), which alleged he suffered nonaccidental physical harm inflicted by his father, Zackary.

At the continued detention hearing held March 17, 2020, the juvenile court ordered the children detained from their mother, supervised visitation to be arranged by the department twice per week between the parents, and the setting of a combined jurisdiction and disposition hearing for May 12, 2020.

*Jurisdiction and Disposition*

The department submitted separate jurisdiction reports, dated July 22, 2020, and disposition reports, dated December 1, 2020, for each child.  The reports recommended that the allegations of each petition be found true, the children be removed from the custody of mother, and family reunification services be ordered for mother, Zackary J., and Adam S., the father of D.S. and S.S.

The children were placed together in a resource family home while relatives began the process for resource family approval.  D.S. and S.S. displayed age-appropriate behavior with no need for mental health services.  R.J. was recommended therapy for adjustment disorder, aggressiveness, and possible attention deficit hyperactivity disorder (ADHD).  Mother tested positive for methamphetamine on March 11, 2020, and she failed to appear for five subsequent drug tests.

Mother participated in supervised visits through phone calls in April of 2020, and she began in-person supervised visits in June of 2020.  The children and mother discussed various topics over the phone and played games together at the park during in-

---

[1]      All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

3.

person visits. No major concerns were documented by the visitation supervisor. The department recommended mother participate in random drug testing and counseling for domestic violence as a victim, failure to protect from physical abuse, and substance abuse.

The jurisdiction hearing proceeded without contest on July 22, 2020. The juvenile court found the allegations of the petitions true and continued the disposition hearing to September 28, 2020. In supplemental reports dated September 25, 2020 and November 13, 2020, the department provided additional information on mother's visitation and progress in her initial case plan. Mother continued to attend supervised visits with the children, however, she missed visits on July 29, 2020, August 8, 2020, August 24, 2020, September 30, 2020. Mother's visits with the children were reported to go well, and mother was able to address concerns that D.S. expressed regarding mother's treatment of her.

At a contested disposition hearing held on December 1, 2020, the juvenile court removed the children from mother's custody and ordered family reunification services to mother and both fathers as recommended in the case plan.

### Family Reunification Period

The department prepared a report for the 12-month review hearing to be held May 4, 2021, which recommended that family reunification services be terminated for each of the children's parents and a section 366.26 hearing be set. On March 27, 2021, the children were placed with the paternal aunt of D.S. and S.S. D.S. told the social worker that she wanted to be adopted by her paternal aunt and she did not believe her mother would ever change. S.S. was "really happy" and wanted to stay in the paternal aunt's home forever. R.J. loved living at the paternal aunt's home and wanted to remain in the home with his sisters if he was unable to reunify with his parents.

The progress report from mother's domestic violence counseling indicated she attended 16 sessions of a 26-week course with eight unexcused absences. A staff member from the domestic violence program stated mother appeared under the influence when she attended the in-person course. Mother entered a substance abuse treatment program on March 31, 2021. However, she self-discharged 10 days later, and told the social worker she would attempt to enroll at a different program. Mother failed to appear for six of her random drug tests, and the one completed drug test showed positive for methamphetamine.

During the reunification period, the quality of mother's supervised visitation was reported to be lacking due to mother talking with other adults during video calls, appearing under the influence, and not focusing on the children. Mother did attend all of her supervised video calls with the children. On occasion, the children screamed for mother to wake up to get her attention.

Mother completed her counseling for domestic violence and failure to protect in May 2021, but she only attended nine of 60 sessions for her substance abuse counseling program since her enrollment in December 2020. Her overall progress in the substance abuse counseling program was unsatisfactory, and she never participated in drug testing for the program. Mother failed to appear for all of the department's drug testing dates except for one negative result on April 28, 2021.

At the contested 12-month review hearing held June 1, 2021, mother objected to the department's recommendation and argued that family reunification services should be continued for her to complete substance abuse treatment. The juvenile court terminated reunification services to mother and both fathers and set a section 366.26 hearing for September 29, 2021. Mother's visitation was to be supervised twice per week with the understanding that the children would not be compelled to visit.

5.

*Section 366.26 Hearing*

A section 388 petition was filed by mother's counsel on September 13, 2021, requesting either family maintenance or reunification services. The petition alleged mother completed a residential substance abuse program on September 9, 2021, and consistently drug tested negative at the program. Mother planned to move into a sober living home where she had the ability to have the children placed in her care. The petition included a letter from the program detailing mother's enrollment on June 11, 2021, and the program's case manager hoped mother would continue to apply the skills she learned in the program.

The department's section 366.26 report, dated September 17, 2021, recommended that the juvenile court terminate the parental rights of mother and both fathers and order a permanent plan of adoption for the children. The children remain placed with their relative care providers who were committed to a permanent plan of adoption. No developmental or medical concerns were noted for the children. D.S., now 13 years old, received individual and family therapy to decrease trauma symptoms related to post-traumatic stress disorder. S.S., now 11 years old, participated in weekly therapy sessions to decrease trauma symptoms and acquire adaptive coping skills. R.J., now eight years old, was enrolled in trauma focused cognitive behavioral therapy and attended sessions weekly.

D.S. and S.S. were both in agreement with the plan of adoption, and S.S. reported she wanted to be adopted because she felt safe and could tell her care provider about her problems. R.J. did not appear to understand the difference between different permanent plans, however, he stated he was in agreement with adoption if he could not return to his mother. Mother attended 104 of 129 possible visits during the 18 months that the children had been removed from her care. Based on the social worker's observation and review of records, she believed the children's relationship with mother diminished from a

6.

strong relationship to a friendly visitor relationship since their removal. In a supplemental report dated September 23, 2021, the department recommended that mother's section 388 petition be denied.

At the contested section 388 and 366.26 hearings held on September 29, 2021, mother testified about her recent efforts in programs and her relationship with the children. She testified that she had not used alcohol or any illegal substances since May 22, 2021. Mother believed she shared a close bond with the children and they had an "awesome" time during each visit. Mother was currently living at a sober living facility with daily groups and random drug testing. She realized she had a drug problem after she completed the program and understood how she was hurting her children and herself.

After hearing argument from counsel on the section 388 petition, the juvenile court denied mother's section 388 petition because it did not believe mother demonstrated changed circumstances. The juvenile court agreed that the changes mother was making were wonderful, but it did not believe that her longstanding substance abuse issues were "turned around in just a few months." Counsel for the parties then proceeded with argument on the section 366.26 hearing regarding the application of the beneficial parent-child relationship exception to adoption.

The juvenile court found mother met the first prong of the beneficial parent-child relationship exception through regular visitation, however, it could not find that the children would benefit from continuing the parent-child relationship. The juvenile court stated:

> "These children and, especially, the older ones, who are a bit more verbal and have gone through more with the parents, they crave stability. They recognize that they have not enjoyed that in their childhood and they want that. They've had a taste of it, and they want that, and they have that. And I do not believe the evidence has established that they would have - - that putting that at risk on the possibility that the mother is going to be continuing to make these changes would be beneficial to them."

The decisions of *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*) and *In re J.D.* (2021) 70 Cal.App.5th 833 were acknowledged by the juvenile court, along with the need for courts to consider the parental relationship in a meaningful way. The juvenile court believed it had meaningfully considered the parental relationship, and it did not find that it would be beneficial for the children to continue the relationship with their parents. The parental rights of mother and the children's fathers were terminated, and a plan of adoption was selected. Mother filed a timely notice of appeal on October 1, 2021.

## DISCUSSION

Mother contends the juvenile court erred by considering inappropriate factors when it determined the beneficial parent-child relationship exception to adoption did not apply. She argues the juvenile court improperly considered mother's progress in services and impliedly considered whether the children would be able to return to her.

## I.    Legal Principles

At a section 366.26 hearing, when the juvenile court finds by clear and convincing evidence the child is adoptable, it is generally required to terminate parental rights and order the child be placed for adoption unless a statutory exception applies. (§ 366.26, subd. (c)(1).) One of the statutory exceptions is the beneficial parent-child relationship exception, which applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Id*., subd. (c)(1)(B)(i).)

A parent claiming an exception to adoption has the burden of proof to establish by a preponderance of evidence that the exception applies. (*In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252.) Thus, the parent must prove three elements in order to prevail under the beneficial relationship exception: "(1) regular *visitation and contact,* and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the

8.

termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631.)

The first element of the beneficial relationship determination asks the "straightforward" question of whether the parent visited consistently, considering the extent permitted by court orders. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) The focus is on the best interest of the child as opposed to punishing or rewarding parents for good behavior in maintaining contact. (*Ibid.*)

The second element of the exception asks whether the child would benefit from continuing the relationship. (*Caden C.*, *supra*, 11 Cal.5th at p. 629.) The parent-child relationship "may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Id.* at p. 632, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) The juvenile court's focus should again be on the child, and it "must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern." (*Caden C.*, *supra*, at p. 632.)

When considering the third element, courts must determine "how the child would be affected by losing the parental relationship – in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) Potential negative effects from severance of the relationship might include "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression." (*Ibid.*) While an adoptive home might provide a new source of stability that alleviates emotional stability and preoccupation leading to those problems, making the loss "not, at least on balance, detrimental." (*Ibid.*) Under this element, the court is again guided by the child's best interest, but in a "specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' " (*Ibid.*)

In *Caden C.*, the Court of Appeal held "that because the parent continued to struggle with substance abuse and mental health issues and because of the risks of foster care and benefits of the potential adoptive home, no reasonable court could find the child's relationship with his parent outweighed the benefits of adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 625-626.) Rejecting that conclusion, our Supreme Court found "[t]he Court of Appeal did not explain how the parent's struggles related to the specific elements of the statutory exception: the importance of the child's relationship with the parent or the detriment of losing that relationship." (*Id*. at p. 626.) A parent's struggles with issues that led to dependency were determined to be relevant only to the extent they inform whether the child would "benefit from continuing the relationship and be harmed, on balance, by losing it[.]" (*Id.* at p. 638.)

## II. Standard of Review

Appellate courts review a juvenile court's ruling on the application of the beneficial parent-child relationship exception using a "hybrid" standard. (*Caden C.*, *supra*, 11 Cal.5th at p. 641.) The substantial evidence standard applies to the first two elements of regular visitation and existence of a beneficial relationship. (*Id.* at pp. 639-640.) The juvenile court's decision as to the third element – whether termination of parental rights would be detrimental to the child – is reviewed for an abuse of discretion. (*Id.* at p. 640.) "Review for abuse of discretion is subtly different, focused not primarily on the evidence but the application of a legal standard. A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id*. at p. 641.)

## III. Analysis

In the present case, the juvenile court determined that mother did not meet her burden of proof as to the application of the beneficial parent-child relationship exception. The parties acknowledge the juvenile court's finding that mother visited regularly and

generally had positive visits as evidenced by the social worker's reports and mother's testimony. However, the juvenile court did not find that there was sufficient evidence that the children would benefit from continuing the parent-child relationship in order to establish the exception.

Mother initially contends the juvenile court stopped its analysis after finding mother did not meet her burden as to the existence of a beneficial relationship, and she argues the court failed to consider the "slew of factors" to determine what relationship the children had with mother. However, the juvenile court was not required to recite specific findings relative to its conclusions regarding the elements of the exception when it declined to apply the exception. Although a trial court's statement of its findings or an explanation of the reasons for its decision may be helpful in conducting appellate review, it is not a legal requirement. (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156.) Thus, the juvenile court did not err in failing to further explain the basis for its decision.

Mother also cites to several recent cases, *In re B.D.* (2021) 66 Cal.App.5th 1218; *In re J.D.*, *supra*, 70 Cal.App.5th 833; and *In re D.M.* (2021) 71 Cal.App.5th 261, in support of her contention that the juvenile court's orders must be reversed for improper consideration of certain factors.

In *In re B.D.*, *supra*, 66 Cal.App.5th 1218, a juvenile court noted that "the social worker's report stated that the paternal grandmother met the children's daily needs and opined that the parents were 'currently not in a position where they are able to take on the parental role.' " (*Id*. at p. 1229.) The juvenile court also emphasized the parents' failure to complete the reunification plan and their continued untreated substance abuse issues. (*Id*. at pp. 1229-1230.) The *In re B.D.* court found the juvenile court's reliance on the fact that the parents had not completed their reunification plan and were unable to meet the children's needs to be "concerning because it is unclear what weight the juvenile court placed on these conclusions when balancing the harm of severing the natural

11.

parent-child relationship to the benefits of a new adoptive home in the crucial third step of the analysis." (*Id.* at p. 1230.) The appellate court reversed, without conducting a harmless error analysis, so the juvenile court could conduct a new parent-child bond exception analysis in light of *Caden C.* (*In re B.D.,* at p. 1231.)

Similarly, in *In re J.D.*, the appellate court concluded that it was unclear to what extent the juvenile court—there, acting before *Caden C.*—considered improper factors at the second step of analyzing the parent-child beneficial relationship exception, and it reversed and remanded for a new section 366.26 hearing in accordance with *Caden C.* (*In re J.D., supra*, 70 Cal.App.5th at pp. 865, 870.) Specifically, it observed that the juvenile court had appeared to improperly consider "the mere fact [that mother] had been unable to succeed in overcoming her parenting struggles," "the suitability of [the minor's] current placement," the minor's attachment to his current caregiver, and the court's determination that mother did not occupy a "parental" role—all factors improper under *Caden C.* (*In re J.D.,* at pp. 864-865.)

Finally, in the case of *In re D.M.*, *supra*, 71 Cal.App.5th 261, the court reversed the order terminating father's parental rights to his three children, ages 13, 10, and six. The appellate court found that the juvenile court incorrectly relied on the father not occupying a parental role, citing the facts that he did not know his children's medical needs and had not attended any of their medical or dental appointments and said nothing about the children's attachment to their father. (*Id.* at p. 270) The appellate court held that it did "not find substantial evidence support[ed] the court's finding[ ] concerning the benefits to the children from continuing the relationship with father." (*Ibid.*)

The cases cited by mother are distinguishable because the juvenile court in this case did not refuse to apply the beneficial parent-child relationship exception based solely on the mother's failure to make "sufficient progress in addressing the problems that led to dependency." (*Caden C.*, *supra*, 11 Cal.5th at p. 637.) A parent's "continued struggles"

with the issues that led to dependency cannot, "standing alone," be a bar to the parental-benefit exception. (*Ibid*.) However, a parent's struggles with the issues that led to the dependency are "relevant to the application of the [parental-benefit] exception" because it may be probative of whether interaction between parent and child has a negative effect on the child. (*Ibid*.) "A parent's struggles may mean that interaction between parent and child at least sometimes has a ' "negative" effect' on the child," while "[c]onversely, a parent who gains greater understanding of herself and her children's needs through treatment may be in a better position to ensure that her interactions with the children have a ' "positive" ... effect' on them." (*Id.* at pp. 637-638.)

In considering the parent-child relationship exception here, the juvenile court began its analysis by discussing the children's need and desire to maintain their current stability. It then reasoned that the evidence did not establish that the children would benefit from putting the children's stability at risk "on the possibility that … mother is going to be continuing to make these changes."

We do not find that, in making this statement, the juvenile court abused its discretion by relying on impermissible factors. The juvenile court's ruling on the exception did not consider whether mother was ready for the children to return to her, and there is no indication that the juvenile court relied on mother's "continued struggles" to bar the parent-child relationship exception. Viewed in its context, the juvenile court considered the proper factors of the children's need for stability and the effect of interactions with mother. On balance, it concluded that ongoing interactions while mother continued making positive changes to her life was not as beneficial as their need for stability.

In addition, the juvenile courts in the cases cited by mother did not have the benefit of *Caden C.*'s clarified legal standard. In contrast, the juvenile court's ruling here specifically acknowledged the decisions of *Caden C.* and *In re J.D.* While the juvenile

court did not expressly assess mother's relationship with the children before and during the dependency, there is no evidence to support a finding the children had the degree of emotional attachment that would signify a beneficial relationship as envisioned by the statute. Under these circumstances, the juvenile court's ruling is entitled to a presumption of correctness, and remand is unwarranted. Therefore, the juvenile court did not err in declining to apply the beneficial parent-child relationship exception, and its orders terminating mother's parental rights were proper.

### **DISPOSITION**

The juvenile court's orders are affirmed.


                                                       SMITH, J.

WE CONCUR:


PEÑA, Acting P. J.


DE SANTOS, J.